# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL ASSOCIATION OF SHEET METAL, AIR, RAIL AND TRANSPORTATION WORKERS – TRANSPORTATION DIVISION, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> IOWA NORTHERN RAILWAY COMPANY, <br><br> Defendant. | No. C21-2038-LTS <br><br><br> **MEMORANDUM OPINION AND ORDER ON PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

_____

## I. INTRODUCTION

This case is before me on plaintiffs' motion (Doc. 7) for a temporary restraining order (TRO) and preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiffs ask the court to (1) order defendant Iowa Northern Railway Company (Iowa Northern) to reverse changes it unilaterally made with regard to employees' rates of pay and the collection of union dues and (2) enjoin Iowa Northern from making further unilateral changes to any issue governed by the parties' collective bargaining agreement (CBA) until the parties' have completed the procedures set forth in the Railway Labor Act (RLA) for negotiating such changes. Plaintiffs argue that Iowa Northern's unilateral changes violate the RLA's requirement that the status quo not be changed while negotiations pursuant to the RLA are ongoing.

Plaintiffs' motion (Doc. 7) was filed July 2, 2021, along with a brief and supporting declarations and exhibits. In response, Iowa Northern filed the declaration (Doc. 15) of William Magee, its General Manager, with accompanying exhibits. I conducted a telephonic hearing on July 13, 2021. Attorneys Mark Hedberg and Erika

Diehl-Gibbons appeared for plaintiffs. Attorneys Chloe Pedersen and James Helenhouse appeared for Iowa Northern, along with its General Counsel, Scott Bannister. No additional evidence was presented. After hearing the parties' arguments, I took the matter under advisement.

## II. BACKGROUND

### A. *The RLA*

The RLA was enacted to facilitate collective bargaining, and help resolve labor disputes, between carriers and labor organizations with the goal of "minimizing interruptions in the Nation's transportation services." *See Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 687–88 (1963); 45 U.S.C. § 151a. To that end, it requires carriers and unions to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes." *Id.* § 152, First. Additionally, once a CBA subject to the RLA is established, it is perpetual and may be changed only through bargaining procedures established by the RLA. 45 U.S.C. §§ 152, Seventh, 156.

The RLA's procedures for changes to a CBA depend on whether the changes give rise to a "major" or "minor" dispute. *See Missouri-Illinois R. Co. v. Ord. of Ry. Conductors & Brakemen*, 322 F.2d 793, 795–96 (8th Cir. 1963). A dispute is "major" if it involves changes to rates of pay, work rules or working conditions. *See Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945), *adhered to on reh'g*, 327 U.S. 661 (1946). A dispute is "minor" when it deals only with the interpretation or application of an otherwise undisputed agreement. *Id.* The parties agree that the dispute here is major.

For major disputes, the RLA first requires the parties to meet and attempt to settle the dispute between themselves. *Missouri-Illinois R. Co.*, 322 F.2d at 795–96; 45 U.S.C. § 156. This process begins with what is known as a "section 6 notice," which the party seeking changes must give at least 30 days before the date it desires to implement the

changes. *See* 45 U.S.C. § 156.[1] Within 10 days of receipt of a section 6 notice, the parties must agree on a time and place to hold an initial conference to begin negotiations, which must take place within the 30 days provided in the notice unless otherwise agreed to by the parties. *Id.* If the parties are unable to reach an agreement during their conferences, either party may invoke the services of the National Mediation Board (NMB) within 10 days of the termination of negotiation conferences. *Id.* §§ 155, First, 156. If neither party seeks mediation after conferences are terminated, the RLA's requirements are met and the party seeking changes to the CBA may resort to "self-help." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 378 (1969).

If the parties resort to mediation with the NMB, but the dispute is not resolved, the NMB has two courses of action. First, it will "endeavor to induce the parties to submit the controversy to binding arbitration, which can take place . . . only if both consent." 45 U.S.C. §§ 155, First, 157. Second, "if arbitration is rejected and the dispute threatens 'substantially to interrupt interstate commerce to a degree such as to deprive any section of the country of essential transportation service, the [NMB] shall notify the President,' who may create an emergency board to investigate and report on the dispute." *Bhd. of R.R. Trainmen*, 394 U.S. at 378 (quoting 45 U.S.C. § 160). If the parties do not agree to binding arbitration, and no emergency board is created, the RLA requires a 30-day cooling off period, after which the RLA's procedure is exhausted and the parties may resort to self-help. 45 U.S.C. § 155, First. If an emergency board is created, the parties are not bound by its recommendations and may resort to self-help 30 days after the board's report.

The RLA's dispute resolution procedure is based on two important premises. The first is that no part of the RLA's procedure is binding, unless both sides voluntarily agree to binding arbitration. *See Bhd. of R.R. Trainmen*, 394 U.S. at 378–79. The purpose of the RLA is not to compel a settlement, but to create procedures that "are purposely long

---

[1] "Section 6" is a reference to 45 U.S.C. § 156, where section 6 of the RLA was codified.

and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *See Bhd. of Ry. & S.S. Clerks, etc. v. Florida E.C.R. Co.*, 384 U.S. 238, 246 (1966). The second premise is that until the RLA's procedures have been exhausted, the parties must maintain the status quo. 45 U.S.C. § 156; *Detroit & T. S. L. R. Co. v. United Transp. Union*, 396 U.S. 142, 149 (1969). The status quo requirement is "central" to the RLA's design, as it gives the party not seeking changes "the power . . . to preserve the status quo for a prolonged period . . . mak[ing] it worth-while for the moving party to compromise with the interests of the other side and thus reach agreement without interruption to commerce." *Detroit*, 396 U.S. at 150.

## B. Factual Background

Plaintiffs and Iowa Northern entered into a CBA on November 15, 2015. The agreement included a moratorium on amendments until April 1, 2020. Despite the moratorium, Iowa Northern proposed changes to the CBA in August 2019. The parties entered into negotiations and reached a tentative agreement to raise pay rates, but union members ultimately rejected it.

On April 1, 2020, when the moratorium expired, plaintiffs initiated the RLA's procedure for making changes to the CBA by providing a Section 6 notice to Iowa Northern that described the desired changes. Conferences to negotiate the proposed changes were delayed by the COVID-19 pandemic and Iowa Northern's refusal to conduct conferences via telephone or video.[2] In-person conferences were eventually held on January 15, March 24 and March 25, 2021. During the March 25 conference, representatives for Iowa Northern allegedly told plaintiffs that prior tentative agreements

---

[2] Parties may waive, or change by agreement, some of the procedural requirements of § 156. *See Childers v. Bhd. of R.R. Trainmen*, 192 F.2d 956, 959 (8th Cir.1951); *see also Ry. Lab. Executives' Ass'n v. Bos. & Maine Corp.*, 664 F. Supp. 605, 611 (D. Me. 1987). It appears Iowa Northern waived the 30-day time limit for an initial conference.

4

were off the table and that plaintiffs would need to "start from scratch" if an agreement were to be made. Negotiations ended abruptly shortly thereafter, but there is a dispute as to who decided to stop negotiations and what exactly each party said. There is also a dispute as to whether, or to what extent, the parties intended and attempted to schedule further conferences in the following weeks.

On May 4, 2021, Iowa Northern submitted its own Section 6 notice to plaintiffs that proposed, among other things, amending the rates of pay and eliminating union fee deductions. On June 5, 2021, Iowa Northern sent a letter to plaintiffs claiming that plaintiffs had received its Section 6 notice on May 10, 2021, and had failed to acknowledge receipt by May 20 and schedule an initial conference by June 4. According to Iowa Northern, negotiations and conferences as to plaintiffs' Section 6 notice had terminated without either party seeking the services of the NMB and, because plaintiffs failed to take any action in response to Iowa Northern's Section 6 notice, Iowa Northern was entitled to enact its proposals (i.e., engage in self-help). It further stated that its proposed changes would go into effect on June 5, although it appears the changes were not implemented until June 16. Plaintiffs submitted a request for mediation to the NMB on June 17, 2021, and the NMB docketed the case on June 23, 2021.

### III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As a result, the party requesting an injunction bears the burden of proving that it is warranted. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011). A district court has considerable discretion in ruling on a request for preliminary injunctive relief. *See Sharpe Holdings, Inc. v. U.S. Dep't of Health & Human Srvs.*, 801 F.3d 927, 936 (8th Cir. 2015), *vacated on other grounds*, 2016 WL 2842448 (2016).

The Eighth Circuit explained the standards for determining whether injunctive relief is appropriate in *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.3d 109, 114 (8th

5

Cir. 1981). Under the *Dataphase* test, the court must consider: (1) the threat of irreparable harm to the movant; (2) the balance between the potential harm and any harm that granting the injunction will cause to other parties to the litigation; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 803 (8th Cir. 2003); *see also Dataphase*, 640 F.2d at 114. However, when a party seeks "to enjoin a violation of the status quo pending completion of the [RLA's] required procedures," a showing of irreparable injury is not required. *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 303 (1989). It is also important to remember that "[n]o single factor is dispositive, as the district court must balance all factors to determine whether the injunction should issue." *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006); *see also Dataphase*, 640 F.2d at 113 ("At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.").

### IV. DISCUSSION

Plaintiffs argue that injunctive relief is necessary to reinstate and preserve the status quo as they continue negotiating changes to the CBA with Iowa Northern pursuant to the RLA. They assert that the negotiations initiated by their April 1, 2020, Section 6 notice are ongoing and that Iowa Northern therefore violated the RLA's status quo provisions when it changed pay rates and stopped collecting union fees on June 16, 2021. They also assert that public interest favors an injunction, as it is in the public's interest to maintain the status quo during CBA negotiations to avoid disruptions to commerce.

Iowa Northern argues that its June 16 changes did not violate the RLA's status quo provisions because it was entitled to self-help due to plaintiffs' failure to timely respond to Iowa Northern's May 4, 2021, Section 6 notice. It asserts that negotiation conferences for plaintiffs' Section 6 notice were terminated on March 25, 2021, when plaintiffs' representatives announced that they did not want to schedule another

6

conference and plaintiffs thereafter failed to contact Iowa Northern about resuming negotiations. Thus, when plaintiffs failed to seek mediation as to their own Section 6 notice in a timely manner, Iowa Northern's subsequent Section 6 notice became the controlling notice and plaintiffs' failure to timely respond to that notice entitled Iowa Northern to resort to self-help. Further, Iowa Northern argues that even if the conferences as to plaintiffs' Section 6 notice were not terminated at the time Iowa Northern filed its Section 6 notice, plaintiffs nonetheless had a duty under the RLA to respond to Iowa Northern's notice, such that their failure to do so entitled Iowa Northern to resort to self-help.

As evinced by the parties' arguments, plaintiffs' likelihood of succeeding on the merits depends primarily on (1) whether negotiation conferences on plaintiffs' Section 6 notice were terminated and, even if they were not, (2) whether plaintiffs' failure to timely respond to Iowa Northern's Section 6 notice allowed Iowa Northern to resort to self-help. If plaintiffs terminated negotiations as to their own Section 6 notice, they are unlikely to succeed on the merits because neither party sought mediation within 10 days of that termination. If plaintiffs did not terminate negotiations as to their own Section 6 notice, their likelihood of success depends on whether, or to what extent, plaintiffs had a duty to respond to Iowa Northern's subsequent Section 6 notice.

With regard to termination, the evidence of record demonstrates a clear factual dispute as to whether plaintiffs terminated negotiations with regard to their Section 6 notice. In order to terminate conferences under the RLA and initiate the limitations period for seeking mediation, a party's termination must be "clear and unequivocal." *See Great Lakes Aviation, Ltd. v. Int'l Ass'n of Machinists Air Transp. Dist. 143*, No. CIV 07-4314 PAM/JSM, 2007 WL 3244077, at *5 (D. Minn. Nov. 1, 2007); *In re Mesaba Aviation, Inc.*, 350 B.R. 112, 131 (Bankr. D. Minn. 2006), *appeal dismissed and remanded*, No. CIV.06-4320(MJD), 2007 WL 978086 (D. Minn. Mar. 28, 2007); *United Transp. Union v. Del. & Hudson Ry. Co.*, 977 F. Supp. 570, 575 (N.D.N.Y. 1997). Plaintiffs and Iowa Northern both blame each other for the abrupt end to

7

negotiations on March 25, 2021. They also disagree about whether plaintiffs stated that they did not wish to schedule another conference and to what extent the parties intended and attempted to continue scheduling conferences as to plaintiffs' Section 6 notice. Based on the current record at this very early stage of this case, I cannot determine whether plaintiffs clearly and unequivocally terminated negotiations. Because plaintiffs' success depends on their ability to show that they did not terminate negotiations as to their Section 6 notice, the uncertainty caused by this factual dispute weighs against granting a preliminary injunction. *See, e.g.*, *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 358 (5th Cir. 1971) ("[C]ourts are more cautious about invoking the extraordinary remedy of the preliminary injunction where critical facts are in dispute.").

Even if it was certain that plaintiffs did not terminate negotiations as to their own Section 6 notice, plaintiffs' likelihood of success on the merits is uncertain due to their failure to timely respond to Iowa Northern's May 4, 2021, Section 6 notice. Plaintiffs argue that they had no duty to respond to that notice because negotiations as to their own Section 6 notice were still in progress. They contend that Iowa Northern's notice was a mere counterproposal to be considered as part of ongoing negotiations, not an independent notice under Section 6 that triggered new deadlines under the RLA.

The plain language of the RLA does not support this argument. Nothing in § 156 limits the number of Section 6 notices that may be filed by either party. *See* 45 U.S.C. § 156; *Missouri-Illinois R. Co.*, 322 F.2d at 798 (finding that ongoing negotiations as to one Section 6 notice do not preclude other notices addressing the same or similar issues from being filed and that the subsequent notices may have independent effect). Indeed, whenever a notice of intended changes is given, § 156 requires the parties to agree on a time and place to meet within 10 days. 45 U.S.C. § 156. While the RLA demands that both parties exert every reasonable effort to meet this requirement, plaintiffs – as the recipients of Iowa Northern's notice – had a duty to respond to the notice in some way. *See Ry. Lab. Executives' Ass'n*, 664 F. Supp. at 611 (finding that a railroad had a duty under § 156 to respond to a union's request for a conference on the railroad's section 6

8

notice outside of the statutorily proscribed period, even though it did not impose a duty to accept such a request). There is no dispute that they failed to do so.

Plaintiffs' likelihood of success on the merits thus comes down to whether their failure to respond to Iowa Northern's Section 6 notice allowed Iowa Northern to engage in self-help. As noted above, there appears to be no dispute that Iowa Northern was entitled to engage in self-help if negotiations had been terminated as to plaintiffs' Section 6 notice. If negotiations were still ongoing when plaintiffs failed to timely respond to Iowa Northern's Section 6 notice, however, the situation is less clear. The parties have not cited, nor have I found, any case law guidance on the issue. Thus, it appears to be one of first impression.

As noted above, maintaining the status quo during negotiation procedures and the ultimate right to resort to self-help are both important premises upon which the RLA is based. *See Bhd. of R.R. Trainmen*, 394 U.S. at 378; *Bhd. of Ry. & S.S. Clerks, Freight Handlers, Exp. & Station Emp., AFL-CIO v. Fla. E. Coast Ry. Co.*, 384 U.S. 238, 244 (1966). Plaintiffs' right to maintain the status quo under the RLA due to the possibility that negotiations were still ongoing as to its own Section 6 notice does not so clearly outweigh Iowa Northern's right to engage in self-help that a preliminary injunction is warranted, especially considering that the public interest generally weighs in favor of a carrier's right to self-help. *See Fla. E. Coast Ry. Co.*, 384 U.S. at 244–45. Due to the uncertainty created by the factual dispute discussed above, and plaintiffs' failure to establish with any clarity that Iowa Northern was not entitled to engage in self-help, plaintiffs have failed to show that they are likely to succeed on the merits. They have also failed to show that other *Dataphase* factors weigh in favor of a preliminary injunction. Injunctive relief is an extraordinary remedy that plaintiffs have not shown to be appropriate under these circumstances. As such, their motion must be denied.

9

## V.  CONCLUSION

For the foregoing reasons, plaintiffs' motion (Doc. 7) for a temporary restraining order and preliminary injunction is **denied**.

**IT IS SO ORDERED.**

**DATED** this 19th day of July, 2021.

_____
Leonard T. Strand, Chief Judge